BLOOMINGDALE v. WILSONS & FURNESS-LEYLAND LINE.

(District Court, S. D. New York. August 10, 1900.)

1. SHIPPING—CONTRACT FOR TRANSPORTATION OF GOODS—RIGHT OF RESCISSION FOR BREACH.

A shipper who contracted with a steamship company for the transportation from New York to London of 100 tons of hay on each of the company's weekly steamers for a year, and who was entitled to rescind the contract because of the frequent failure of the company to take the required quantity which was tendered, waived such right by electing to treat the contract as still in force, and making subsequent shipments thereunder, and could not thereafter rescind because of such past defaults.

2. SAME—DAMAGES FOR BREACH.

A shipper who contracted for the transportation to a foreign market of a certain quantity of hay each week cannot recover damages for the failure of the carrier on some occasions to take the required quantity, where it is not shown that there was any request that the deficiency should be made good in subsequent shipments, or any tender of the quantity necessary therefor, or that libelant suffered any actual loss by reason of the breach of the contract.

In Admiralty. Action for breach of shipping contract.

L. Barton Case, Esq., for libelant.
Convers & Kirlin and Burlingham & Hickox, for respondent.

BROWN, District Judge. The above libel was filed to recover damages for the alleged breach of a contract in writing made on April 30, 1898, whereby the above parties agreed for the transportation from New York to London of 100 tons of compressed hay in bales upon each steamer of respondent's line, expected to sail weekly, from May 14, 1898, to May 13, 1899, inclusive, at the rate of 22½ shillings sterling per ton.

Shipments under the contract began May 21st, and were continued weekly, though irregular as to the quantities taken, until the last week in August, 1898, when the libelant refused to ship any more hay. The notice of refusal was an oral notice to the broker only, without any reasons then assigned, and without any formal claim of a right to rescind the contract for breaches of it by the respondent, although there had previously been verbal statements to the respondent that it was not taking the amount of hay contracted for. The price of freights declined soon after the contract was made, and at the time when the contract was broken off by the libelant, they had fallen about five shillings per ton and remained lower during most if not all the remainder of the contract period.

The evidence shows that 100 tons of hay were tendered for the steamer that sailed on May 14th, and no satisfactory explanation of the steamer's omission to take it is given. After that, more or less hay was taken on every weekly steamer, sometimes as much as 176 tons; at other times less than 100 tons, usually much less. Up to August 1st, when the contract was turned over to the Atlantic Transport Company, only about 747 tons in all had been carried in the 11 weekly steamers, which, by the contract, should have carried

1,100 tons. The libelant's agent, Franghiardi, who had charge of the shipments, testifies generally that he always had at least 100 tons alongside in readiness for every weekly steamer. But what was left unloaded by the earlier steamer was usually taken by the next. No specific objection was made to this course, nor was any demand ever made by the libelant that any previous deficit in shipment should be made good by a corresponding subsequent increase in the amount taken by the following steamer, so as to keep up an average of 100 tons weekly. The libelant did not tender to subsequent vessels the additional tons requisite to make up previous deficiencies, and Mr. Franghiardi distinctly testifies that the respondent's line, up to the end of July, carried every pound of hay that had been tendered to them.

After August 1st, when the Atlantic Transport Company assumed performance of the contract, the weight of the evidence is clearly to the effect that the failure to carry the full amount of 100 tons weekly was due to the libelant's default in not supplying enough hay, fit to carry, in time for shipment. Some of the lighter loads of hay that were tendered were so musty or damaged that they had to be reconditioned in part before they were fit to load; and the evidence shows that in August all was taken on board promptly that was in fit condition, and as soon as it was ready, and that efforts were made on the ship's behalf to procure more hay from the libelant to fill up the vessels; that on such requests hay was not supplied, to the respondent's loss, which is claimed to be offset against anything due to the libelant for demurrages accruing in the earlier period.

1. The amount of hay carried prior to August 1st was so frequently far less than the contract requirement, that the libelant no doubt might have rescinded the contract at any time when the respondent neglected or refused to take on board the amount tendered to him, within the agreed limit had the respondent elected to rescind the contract on that ground at the proper time. But he did not do so. After each of the several defaults of the ship to take 100 tons, up to August 1st, the libelant elected to treat the contract as still subsisting, by the subsequent shipment of hay under the contract. This estopped him from thereafter rescinding the contract on the mere ground that the ship had carried less than agreed on some trips prior to such subsequent shipments. See McNaughter v. Cassally, 16 Fed. Cas. 322 (No. 8,911). His right to recover any actual damages from such prior defaults remained, however, unaffected; but his right to rescind was limited to some new defaults, if any; and as I have already said, the subsequent failure, after August 1st, to carry 100 tons per week, arose from the libelant's own default in not supplying sufficient hay in fit condition, and not through any default of the respondent or of the Atlantic Transport Company, since they were ready and prepared each week in August to carry 100 tons or more, and were desirous of doing so.

The respondent's agent testifies that the amount and time of shipment prior to August 1st were regulated by mutual arrangement and

105 F.—25

for mutual accommodation. Although Franghiardi does not agree to this, no formal protest or formal complaint against the short shipments was ever made, nor claim of damages made till long afterwards, nor was there ever any request, oral or written, that the subsequent vessels should make good prior deficiencies in the amounts shipped, nor any tender by the libelant of the quantity necessary therefor. The only complaint testified to is the simple statement to the ship agent that he was not taking the agreed quantity. The fair inference from all these circumstances, together with the fact that no evidence has been given of any damage suffered by the libelant from the failure to take the whole quantity agreed on, is that the libelant, considering the declining price of freights, acquiesced in the short shipments from time to time until, finding the much lower price of freights likely to be lasting, he concluded to abandon the contract altogether. Whether this be so or not, the libelant, after making four weekly shipments in August, and being himself in default in the timely supply of bales in fit condition for shipment to the amount of 100 tons weekly for those shipments, could not afterwards rescind the contract for mere omissions by the line theretofore to take the full quantity agreed on.

2. Damages. Had the respondent neglected or refused, prior to August, to take any hay tendered by the libelant under the contract, which the libelant, in consequence of such neglect or refusal, thereafter transported at an additional expense, or sold at a loss in market price, he might have recovered such damages. But there was no such tender or refusal. The libel alleges it but the evidence disproves it, showing only some delay in carrying what was tendered; and there is no charge in the libel or proof in evidence of any loss by this delay. The libel also alleges a loss on the sale of the hay not carried; but there is no evidence of this, nor if there was would it be material without proof that it was offered for transportation, which the evidence disproves.

3. Demurrage. Some loss to the libelant is admitted by demurrage charges which he was obliged to pay for the detention of lighters through the delay of the steamers in unloading the hay, within the required period, and there is general evidence of such charges paid by the libelant; there is also general evidence of the loss of freight by the steamers sailing weekly in August, in consequence of the failure of the libelant to supply 100 tons fit to carry, prior to the libelant's notice of rescission. Should the former exceed the latter, the libelant is entitled to a decree for the excess. If the parties cannot agree upon the facts in this regard, a reference may be taken to compute the amounts. Should the loss of freight exceed the demurrage charges for which the respondent is liable, the latter will be entitled to a dismissal of the libel with costs.